**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FAIR HOUSING JUSTICE CENTER, INC.,<br>*Plaintiff*,<br>v.<br>BLUEJAY MANAGEMENT LLC, STUDIO GALLOS LLC, ND ARCHITECTURE & DESIGN P.C., 50 CLARKSON PARTNERS LLC, 45 LENOX PARTNERS LLC, and 1233 EPW LLC,<br>*Defendants*. | **Case No. 26-CV-**<br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Fair Housing Justice Center, Inc. ("FHJC"), by and through its attorneys Eisenberg & Baum, LLP, states its Complaint against Defendants Bluejay Management LLC, Studio Gallos LLC, ND Architecture & Design P.C., 50 Clarkson Partners LLC, 45 Lenox Partners LLC, and 1233 EPW LLC:

## INTRODUCTION

1. Inaccessible buildings invoke a history of exclusion and have no place in the nation's largest city, especially when design and construction guidelines have been on the books for decades. Defendants cannot flout these laws with abandon.

2. FHJC is a non-profit organization that ensures that all people, including people with mobility disabilities, have equal access to housing in New York City and surrounding counties.

3. Defendants are involved in the design, construction, ownership, management, and leasing of 50 Clarkson Avenue, 45 Lenox Road, and 1233-1237 Eastern Parkway, which are apartment buildings in Brooklyn, NY (together, the "Subject Properties"). Testing by FHJC revealed that Defendants' buildings are inaccessible to New Yorkers with physical disabilities.

Specifically, Defendants discriminate against both prospective and current residents with mobility disabilities by failing to ensure the accessibility of their housing units and common areas, thereby denying these individuals equal access to Defendants' housing and services.

4. FHJC's fair housing testers ("Testers") revealed numerous accessibility barriers at the Subject Properties. Outdoor areas, such as private balconies and shared courtyards, are only accessible by steps or unbeveled thresholds, effectively denying individuals with mobility disabilities the use and enjoyment of these amenities. For instance, the courtyard at 45 Lenox Road has one 8-inch step from the inside and a 4-inch step down onto the balcony with no alternative accessible entrance, making it impossible to navigate by wheelchair users or other residents with mobility disabilities.

5. Defendants failed to ensure that common areas provide accessible routes for individuals with physical disabilities.

6. Units also fail to comply with accessibility standards set by the United States Department of Housing and Urban Development ("HUD"), significantly limiting the ability of individuals with disabilities to live independently and equitably access their homes.

7. Despite these barriers, Defendants have not made the necessary modifications or implemented policies to address the inaccessibility of the Subject Properties, even though city, state, and federal law have long mandated accessible housing for people with physical disabilities. Defendants' continued failure to provide an accessible housing environment perpetuates systemic discrimination against individuals with mobility disabilities.

8. Defendants willfully disregard their legal obligations to design and construct buildings with accessibility features. As a direct consequence, Defendants' residential housing is unavailable to people with physical disabilities.

9. For nearly two decades, FHJC has worked to promote equal housing for all within

its service area, including New York City, and to remedy the housing discrimination encountered by persons with disabilities. FHJC employs a variety of tools to protect and expand equal housing opportunities.

10. FHJC seeks to stop the unlawful practices that Defendants have perpetuated.

11. FHJC has devoted significant resources to identify and counteract Defendants' discriminatory practices that interfere with FHJC's longstanding core activity of reducing the amount of inaccessible homes in New York City. Defendants' inaccessible construction perceptibly impairs FHJC's core activities, and Defendants directly impair FHJC's role of facilitating open, inclusive, and accessible housing.

12. Accordingly, FHJC brings this lawsuit to compel Defendants to cease their unlawful discriminatory practices and to implement policies, procedures, and physical alterations to ensure accessibility, full and equal enjoyment, and a meaningful opportunity for individuals with mobility disabilities to reside in and benefit from Defendants' housing and services. FHJC seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorney's fees and costs to redress Defendants' unlawful disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*.; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq*.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

**<u>JURISDICTION AND VENUE</u>**

13. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C § 3613 because this action involves federal questions regarding the deprivation of Plaintiff's rights under the federal Fair Housing Act. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related claims arising under New York State and City law.

14. Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b) because Defendants' acts of discrimination occurred in this District and the underlying buildings that are the subject of this action are located in this District.

## THE PARTIES

15. FHJC is a non-profit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region by eliminating housing discrimination and creating open and inclusive communities. FHJC's principal office is located in the Eastern District of New York.

16. One of FHJC's core activities is reducing the amount of homes that are inaccessible to people with physical disabilities and proportionally increasing the amount of accessible homes in New York City.

17. Among other things, FHJC:

a) provides funding to retrofit existing inaccessible housing and make it accessible through the Adele Friedman Housing Accessibility Fund ("the Fund"), as detailed below;

b) provides counseling services and assistance to individuals with disabilities who contact FHJC seeking accommodations or modifications to make their inaccessible housing accessible;

c) provides information to the public and other non-profit organizations in the New York City area about fair housing laws, including accessibility requirements, and the services it provides;

d) makes public records requests to evaluate building plans for compliance with fair housing laws and to assess the structural feasibility of potential modifications;

e) organizes and hosts design and construction webinars and trainings for

architects, engineers, developers, and attorneys on accessibility requirements;

f) provides intake counseling to individuals and organizations who have made allegations of housing discrimination;

g) conducts testing and other investigations of allegations of housing discrimination;

h) makes legal referrals to cooperating attorneys;

i) provides legal training for attorneys representing plaintiffs and complainants in housing discrimination matters;

j) provides post-referral litigation support services; and

k) conducts monitoring of settlement agreements, including compliance testing.

FHJC provides these services free of charge.

18. To further its mission of increasing the amount of accessible homes for people with disabilities, FHJC engages in a number of additional activities, including helping individuals request reasonable accommodations or reasonable modifications and administering a housing accessibility fund that provides assistance to renters who need reasonable modifications to their housing to make it accessible.

19. For individuals who require financial assistance with reasonable modifications and may be assisted by the Adele Friedman Housing Accessibility Fund (the "Fund") for the purpose of providing financial assistance to persons with physical disabilities within FHJC's service area who need reasonable modifications made to their existing housing to make it accessible. FHJC staff works with the individual requesting the modification from initial intake to completion of the modification, including drafting and negotiating modification requests with landlords, management companies, and co-op and condominium boards. FHJC guides such individuals through the application process, works with cooperating architects, and acts as project manager,

retaining architects and contractors as needed, communicating with housing providers about coverage of projected costs, and negotiating with housing providers over payment for costs and related contracts.

20. FHJC has employed staff since its inception in 2005 to assist residents within its service area to make reasonable accommodation and modification requests to their landlords, condo and cooperative boards, and/or in other multi-family housing to make their housing more accessible on a case-by-case basis, even though fair housing laws require new housing construction to meet certain minimum accessibility criteria—precisely to avoid the need to modify buildings and units one at a time. FHJC staff review each individual's eligibility for reasonable accommodations and/or modifications through an intake counseling process; help individuals obtain medical support, if needed, for their requests; assist in drafting and making requests; and oversee the implementation of any approved requests, including inspecting retrofits after work is completed to ensure the resident's needs are met, and, where required, coordinate the removal of modifications after a resident moves out of a rental unit. FHJC staff also provides information about options to residents if their requests for reasonable accommodations are denied.

21. FHJC recruits and compensates architects to evaluate a person's dwelling, propose necessary modifications, and provide a written proposal for the proposed modifications for a landlord or condo/co-op board. Through the Fund, FHJC also pays for those modifications where a landlord or condo/co-op board is not required by law to pay for them and the resident is moderate- or low-income.

22. FHJC makes public records requests to evaluate building plans for compliance with fair housing laws and to assess the structural feasibility of potential modifications.

23. FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing

enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

24. Federal, state, and local fair housing laws are intended to create open, inclusive, and accessible communities.

25. In its twenty years of operation, FHJC continues to find that the accessibility requirements of these laws regarding reasonable accommodations and modifications and new construction are not fully complied with by entities like Defendants, which have designed and constructed inaccessible housing.

26. Defendants' ongoing and continuing failures to comply with these laws impair FHJC's core activities. When developers and others—like Defendants—continue to build new housing that is not accessible, the supply of inaccessible housing in FHJC's service area expands and the proportional amount of accessible and adaptable housing is reduced. This impacts the Fund by creating the need to retrofit more housing and drains FHJC's resources by requiring FHJC staff to expend time assisting more tenants and homeowners to counteract Defendants' creation of more inaccessible housing.

27. Defendants' construction frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in New York by, among other things, making their housing facility inaccessible to individuals with disabilities. If Defendants complied with the accessibility requirements of federal, state, and local fair housing, the need for these services would be reduced and FHJC's ability to accomplish its mission of creating accessible communities would not be thwarted. In other words, Defendants would not cause FHJC any injury if they followed the law.

28. FHJC staff create and disseminate consumer fact sheets and other information on its website and through social media, especially since many residents within FHJC's service area are not aware of their right to seek housing modifications or of FHJC's services. FHJC staff also

make in-person and virtual presentations to educate the public and social service organizations that serve people with disabilities about accessibility requirements for new construction.

29. FHJC also provides periodic training for architects and developers on accessibility requirements for new construction, even though these standards were first adopted by Congress in 1989, more than 35 years ago.

30. Defendants' construction of more inaccessible contradicts the education and outreach FHJC does about accessible housing. FHJC tells the public, including people with disabilities and non-profits that support them, that housing constructed since 1991 is built accessibly, yet Defendants continue to build and offer new housing that is not accessible. To address this disconnect, FHJC is forced to devote resources to ensuring new housing is, in fact, built accessibly. That disconnect harms FHJC by sowing confusion and frustration in the communities it serves and undermining the community's trust in the reliability of FHJC's educational materials.

31. Defendants' discriminatory housing practices undermine FHJC's reputation and erode the good will built within the community, thereby affecting the willingness of other housing providers to comply with fair housing requirements and impairing FHJC's ability to perform its core activities.

32. Through its multi-faceted work, FHJC has consistently found that developers, landlords, architects, and contractors like the Defendants in this case are not fully complying with the accessibility requirements of federal, state, and local fair housing laws regarding reasonable accommodations, modifications, and new construction. This lack of compliance has created thousands of inaccessible multi-family dwelling units in New York City, including the Subject Properties, which were designed and constructed by Defendants decades after the requirements of these laws went into effect in 1991.

33. These ongoing and continuing failures to comply with laws intended to create open, inclusive, and accessible communities consistent with FHJC's mission injure and impair FHJC's core activities and its ability to accomplish its mission. For example, when developers, landlords, architects, and contractors such as Defendants design and construct inaccessible housing, the supply of accessible and adaptable housing is limited within the area that FHJC serves.

34. FHJC employs "Testers," who are individuals who pose as prospective renters, home buyers, residents, and the like for the purpose of obtaining information about the conduct of local governments, landlords, real estate agents, companies, and other housing providers to observe their ordinary, unvarnished business practices. FHJC provides extensive training not only for testers who use wheelchairs and other mobility aids but also those who do not to conduct measuring tests.

35. Before participating in a testing investigation coordinated by FHJC, the testers receive training from FHJC regarding, among other things, taking measurements and preparing tester report forms.

36. FHJC engages in testing to identify whether new housing is compliant. Just as FHJC directly assists individuals with obtaining reasonable accommodations or modifications for themselves, FHJC deploys testers as one means of pursuing its core activity of increasing the supply of accessible housing. When FHJC uncovers violations and is the catalyst for subsequent remedial steps, including through litigation or administrative proceedings, FHJC expands the pool of available housing for individuals with disabilities.

37. FHJC expended its limited staff time, funds, and other valuable resources to investigate, respond to, counter, and stop Defendants' discriminatory practices, including conducting a testing investigation. FHJC expects to incur future economic costs in the form of staff time and other resources to ensure that Defendants do not continue to violate fair housing laws and

to repair harm caused by Defendants' actions.

38. Indeed, FHJC's staff is mighty but resource-constrained: they must modify units slowly, painstakingly, one at a time. Defendants impair the staff's ability to function and perform effectively by adding dozens of units of inaccessible housing at once.

39. 50 Clarkson Avenue is an 8-Story, 98-unit apartment building located in Brooklyn, NY 11226. Its final Certificate of Occupancy was issued December 6, 2021.

40. 45 Lenox Road is an 8-Story, 46-unit apartment building located in Brooklyn, NY 11226. Its final Certificate of Occupancy was issued September 24, 2024.

41. 1233-1237 Eastern Parkway is a 6-Story, 51-unit apartment building located in Brooklyn, NY 11213. Its final Certificate of Occupancy was issued September 3, 2025.

42. Defendant Bluejay Management LLC is the developer, of the Subject Properties. Defendant is a New York domestic limited-liability company doing business in this judicial district, with its principal place of business located at 301 Mill Road, Suite L6, Hewlett, NY 11557.

43. Defendant Studio Gallos LLC is the architecture firm responsible for the design and construction of 45 Lenox Road and 1233-1237 Eastern Parkway. Defendant is a New York domestic limited-liability company doing business in this judicial district, with its principal place of business located at 147 Maujer Street, Suite 1B, Brooklyn, NY 11206.

44. Defendant ND Architecture & Design P.C. is the architecture firm responsible for the design and construction of 50 Clarkson Street. Defendant is a New York domestic limited-liability company doing business in this judicial district, with its principal place of business located at 499 Van Brunt Street, Unit 9B, Brooklyn, NY 11231.

45. Defendant 50 Clarkson Partners LLC owns and operates the apartment building at 50 Clarkson Avenue, with its principal place of business located at 301 Mill Road, Suite L6, Hewlett, NY 11557.

46. Defendant 45 Lenox Partners LLC owns and operates the apartment building at 45 Lenox Road, with its principal place of business located at 301 Mill Road, Suite L6, Hewlett, NY 11557.

47. Defendant 1233 EPW LLC owns and operates the apartment building at 1233-1237 Eastern Parkway, with its principal place of business located at 301 Mill Road, Suite L6, Hewlett, NY 11557.

48. Defendants owned, designed, constructed, and/or otherwise participate in the development and leasing of the Subject Properties, each of which violates of city, state, and federal accessibility requirements.

49. Each Defendant participated in the design and construction process for 50 Clarkson Avenue and/or 45 Lenox Road and/or 1233-1237 Eastern Parkway and/or, upon information and belief, was able to exercise sufficient control and/or authority to undertake to remedy 50 Clarkson Avenue and/or 45 Lenox Road and/or 1233-1237 Eastern Parkway or otherwise to make Defendants' facilities accessible to people with disabilities and/or compliant with applicable accessibility laws. Consequently, each Defendant had an independent, nondelegable duty to comply with the accessibility requirements of the fair housing laws.

## STATEMENT OF FACTS

### Statutory and Regulatory Framework

50. In 1988, Congress enacted comprehensive amendments to the Fair Housing Act, effectuating design and construction accessibility requirements to prohibit discrimination on the basis of disability. Legislative history shows congressional intention to reflect the "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with

handicaps[1] from the American mainstream." H.R. Rep. No. 100-711.

51. When doing so, Congress aptly described the discriminatory effect created by architectural barriers that prevent the use and enjoyment of a dwelling: "A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying 'No Handicapped People Allowed.'" *Id.*

52. Poorly designed and constructed buildings often exclude people with physical disabilities, including those who use wheelchairs. To remedy that, the FHA mandates that multi-family residential buildings containing four or more units and built for first occupancy after March 13, 1991 ("covered multifamily dwellings") meet certain design and construction requirements. According to 42 U.S.C. § 3604(f)(3), covered multifamily dwellings must provide, among other things:

a) at least one accessible building entrance on an accessible route;

b) accessible and usable public- and common-use areas, which include all parts of the building beyond the individual units;

c) doors designed to allow passage into and within all premises in such dwellings that are sufficiently wide to allow passage by persons using wheelchairs;

d) an accessible route into and through each dwelling;

e) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

f) reinforcements in bathroom walls that allow for the later installation of grab bars;

[1] The term "disability" is generally more accepted, and this Complaint uses the two terms interchangeably because they carry the same legal meaning. *See Bradgon v. Abbott*, 524 U.S. 624, 631 (1998).

and

g) usable kitchens and bathrooms such that a person using a wheelchair can maneuver about the space.

53. To give meaning to the FHA design and construction requirements, HUD promulgated the final FHA design and construction regulations in January 1989. 24 C.F.R. § 100.205. HUD published the final Fair Housing Accessibility Guidelines on March 6, 1991, 56 Fed. Reg. 9472, which incorporate the requirements of the American National Standard for Buildings and Facilities providing accessibility and usability for people with physical disabilities, A117-1-1986; HUD also published the Fair Housing Act Design Manual in August 1996, which was revised in August 1998, and the Accessibility Requirements for Covered Multifamily Dwellings under the Fair Housing Act in April 2013.

54. With nearly identical language to its federal counterpart, the New York State Human Rights Law prohibits failing to design and construct covered multi-family dwellings in an accessible manner. New York Executive Law, Art. 15 §§ 296(5), (18).

55. The New York City Human Rights Law likewise prohibits discrimination in housing accommodations. Section 28-701.2, § BC 1101 of the NYC Administrative Code contains the accessibility requirements under the New York City Building Code. Sections 8-107(5) and (15) characterize the failure to comply with those accessibility requirements as an unlawful deprivation of the full use and enjoyment of a housing accommodation by individuals with disabilities.

**Inaccessible Features at 50 Clarkson Avenue**

56. On December 16, 2024, Tester U.C. inquired about a tour of available units at 50 Clarkson Avenue through Streeteasy.com.

57. The following day on December 17, 2024, Testers (U.C & L.D.) arrived for the appointment and viewed Unit #406 and #PH5.

58. They observed that the top row of mailboxes in the mailroom measured 49 inches from the ground to the top keyhole. This exceeds the required height of 48 inches, violating accessibility standards.

59. Further, the garbage chute in the building is equipped with a T-bar handle, which is not accessible to individuals with limited hand strength or dexterity. The required accessible hardware for such features must be usable by individuals with disabilities, typically through a U-shaped or other compliant handle design.

60. The entry into the garage has an unbeveled threshold that is 1 inch high.

61. The entry into the gym has an unbeveled threshold that is ¾ inch high.

62. The entry into the communal lounge has an unbeveled threshold that is ½ inch high.

63. Unbeveled thresholds cannot exceed ¼ inch. Beveled common amenities thresholds cannot exceed ¾ inches with a 1:2 slope, making these features non-compliant with accessibility requirements.

64. The interior doors in Unit #406 measured between 31 and 31 ¼ inches wide.

65. The interior doors in Unit #PH5 measured between 31 and 31 ½ inches wide.

66. These measurements for all of these doors fall below the required minimum of nominal (31 5/8ths) 32 inches for accessibility.

67. The electrical outlet in the living room of Unit #406 measured 13 inches from the floor to the topmost usable portion of the outlet. In the bedroom, the outlet measured 14 inches from the floor to the topmost usable portion of the outlet.

68. The electrical outlet in the living room of Unit #PH5 measured 13 inches from the floor to the topmost usable portion of the outlet. In both the kitchen and the bedroom, the outlet measured 14 inches from the floor to the topmost usable portion of the outlet.

69. The required height of accessible electrical outlets is between 15 and 48 inches

from the floor to the topmost suable portion of the outlet.

70. Similarly, the thermostat in the living room of Unit #406 measured 53 inches from the floor to the topmost usable part of the thermostat, while the thermostat in the bedroom measured 51 inches from the floor to the topmost usable part of the thermostat.

71. In Unit #PH5, the thermostat in the living room measured 53 inches from the floor to the topmost usable part of the thermostat. The bedroom thermostat measured 54 inches from the floor to the topmost usable part of the thermostat.

72. Just as the requirement for electrical outlets, a thermostat must be between 15 and 48 inches from the floor to the topmost usable portion of the thermostat.

73. FHJC also obtained and reviewed the building plans and other publicly available documents for 50 Clarkson Avenue.

74. Additional examples of inaccessible features identified by FHJC include:

a) There is insufficient maneuvering clearance adjacent to the latch on the pull side of the doors to the Lounge and Laundry Rooms;

b) There is insufficient maneuvering clearance adjacent to the latch on the pull side of the door from the Cellar to Bicycle Storage; and

c) In two unit types, there is insufficient clear floor space centered on the range.

**Inaccessible Features at 45 Lenox Road**

75. On November 19, 2024, Plaintiff's Tester, A.W., inquired about a tour of available 45 Lenox Road units via text message.

76. On November 21, 2024, A.W. arrived for the appointment and viewed Unit #1A, #1E, and #5E.

77. The public courtyard can only be accessed by an 8-inch step-up from the inside of the building and a 4-inch step down onto the balcony. There is no other entrance.

78. Unbeveled thresholds cannot exceed ¼ inch in height.

79. The interior door leading to the private balcony of Unit #5E measures 31 inches wide. Nominal 32 inches is the minimum width required.

80. Additionally, the balcony of Unit #5E has a 1-inch unbeveled step from the inside of the unit.

81. In all three units, #1A, #1E, and #5E, all thermostats measure 52 inches from the floor to the topmost usable portion of the thermostat and do not have remote controls.

82. Again, a thermostat must be between 15 and 48 inches from the floor to the topmost usable portion of the thermostat.

83. FHJC also obtained and reviewed the building plans and other publicly available documents for 45 Lennox Road.

84. Additional examples of inaccessible features identified by FHJC include:

a) The ramp at the residential entrance has a landing 48 inches in length at the top and bottom when the requirement is 60 inches in length;

b) There is insufficient maneuvering clearance for the door to the Bicycle Parking; and

c) In multiple unit types, there is insufficient clear floor space centered on the range.

**Inaccessible Features at 1233-1237 Eastern Parkway**

85. On March 28, 2025, Plaintiff's Testers, C.V. inquired about a tour of available 1233-1237 Eastern Parkway units via email.

86. On April 2, 2025, Testers (C.V. and L.D.) arrived for the appointment and viewed Unit #1F, #1G, #5B, #5C, and #5F.

87. The entry to the garage has a beveled threshold that is between 1 ¼ and 2 inches high.

88. Beveled thresholds cannot exceed 1¼ inch in height.

89. The interior doors in Unit #5B were too narrow in two instances. The walk-in closet door measured 27 ¼ inches wide, and the balcony door measured 31 ½ inches wide.

90. Similarly, in Unit #5C, the balcony door measured 30 ¾ inches wide.

91. In Unit #5F, the walk-in closet door measured 27 ¼ inches wide, and the balcony door measured 30 ¾ inches wide.

92. Again, in Unit #1G, the balcony door measured 30 ¾ inches wide.

93. Lastly, the interior doors in Unit #1F were too narrow in two instances. The walk-in closet door measured 27 ½ inches wide, and the balcony door measured 31 inches wide.

94. The minimum nominal required width for all doorways is 32 inches.

95. In Unit #5B, the front door has a beveled threshold that measures 1 inch high, and the balcony doorway has a beveled threshold that is 1 ½ inches high. Lastly, the balcony entrance has a step down onto balcony that is 4 ½ inches high.

96. Similarly, Unit #5C has a 4 ½ inch step down onto the balcony.

97. The balcony door in Unit #5F has a beveled threshold of 1 inch high and a 5-inch step down onto the balcony.

98. In Unit #1G, the balcony door has a threshold with a 4 ¾-inch step up.

99. Lastly, in Unit #1F, the balcony door has a 5 ¼-inch unbeveled step up.

100. The electrical outlets of all five units measure between 13 ½ and 14 inches from the floor to the bottom-most useable portion of the outlet, which does not meet the requirement for electrical outlets to be between 15 and 48 inches from the floor.

101. The placement of the thermostats viewed were not compliant and do not have remote controls.

102. In Unit #5B, the thermostats measure between 50 and 52 ½ inches from the floor to the topmost usable portion of the thermostat.

103. In Unit #5C, the thermostats measure 54 ½ inches from the floor to the topmost usable portion of the thermostat.

104. In Unit #1G, the thermostats measure 53 ½ inches from the floor to the topmost usable portion of the thermostat.

105. Like electrical outlets, thermostats are required to be between 15 and 48 inches from the floor to the topmost usable portion of the thermostat.

106. FHJC also obtained and reviewed the building plans and other publicly available documents for 1233-1237 Eastern Parkway.

107. Additional examples of inaccessible features identified by FHJC include:

a) There is insufficient maneuvering clearance adjacent to the latch on the pull side of the doors to the Recreation Space and the single-user Toilet Room in the common area; and

b) A column obstructs the required clearance of at least 56 inches must be provided perpendicular to the rear wall for the approach to the water closet in the single user toilet room and the column obstructs this clearance.

**Allegations as to All of the Subject Properties**

108. Following its testing, FHJC expended additional resources investigating Defendants' violations, including to obtain and analyze the as-filed architectural plans for Defendants' buildings.

109. As a direct result of their illegal and discriminatory actions described above, Defendants have injured FHJC by impairing its core business activity of reducing the amount of homes that are inaccessible to people with physical disabilities and proportionally increasing the amount of accessible homes in New York City.

110. Defendants have contributed to the depletion of the Fund by failing to comply with

the accessibility requirements of the fair housing laws in their design and construction of the Subject Properties, thereby creating more inaccessible housing stock in the New York City area and increasing the need for modifications to such housing. Defendants caused FHJC to devote its scarce resources toward investigating, identifying, and counteracting Defendants' discriminatory housing practices. These resources otherwise would have been used to engage in other activities and provide other services, including, among other things, providing intake counseling services to individuals and organizations, assisting residents within its service area to make reasonable accommodation and modification requests to their landlords, and providing information to the public and other non-profit organizations about accessibility law.

**Defendants' Ongoing Pattern and Practice of Unlawful Design and Construction of Residential Housing**

111. The inaccessible features are similar across the Subject Properties, including inaccessible mailboxes and environmental controls at each of the buildings, and consistently inaccessible thresholds and clearances. That these Subject Properties all developed within a few years of each other and have many of the same barriers to access indicates that Defendants, their related entities, and the design-and-construction professionals engaged to build the Subject Properties, have a regular practice of designing and constructing multi-family residential dwellings in the city and state of New York that do not comply with the accessibility requirements of the FHA, the NYSHRL, or the NYCHRL.

112. Upon information and belief, Defendants' continued development of buildings within FHJC's geographical reach raises a concern that current and future projects will not comply with the accessibility requirements of federal, state, and local fair housing laws.

## FIRST CAUSE OF ACTION

Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C)
Against All Defendants

113. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

114. The Subject Properties are each a "covered multi-family dwelling" as defined by 42 U.S.C. § 3604(f)(7).

115. Defendants own and lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

116. The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

117. Further, Defendants have failed to comply with the accessibility requirements set forth in the FHA by failing to ensure the accessibility of common areas, thresholds, balconies, trash chutes, light switches, and more. 42 U.S.C. § 3604(f)(3)(C).

118. Defendants discriminated on the basis of disability in violation of the above-cited provisions of the FHA.

119. Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by Defendants' discriminatory conduct, and has suffered damages as a result.

120. Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

## SECOND CAUSE OF ACTION

New York State Human Rights Law, N.Y. Exec. Law § 296(5), (18)
Against All Defendants

121. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

122. At all times relevant to the action, the New York Human Rights Law, Article 15 of the New York Executive Law § 290, et seq. has been in full force and effect and has applied to Defendants' conduct.

123. Plaintiff is a person as defined by New York Executive Law § 292(1).

124. At all times relevant to the action, Defendants have been housing accommodations within the meaning of N.Y. Exec. L. § 292(10).

125. Defendants' design and construction of inaccessible housing constitutes unlawful discrimination against people with disabilities, under New York Executive Law §§ 296(5), (18).

126. As a direct and proximate result of Defendants' failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYSHRL, Plaintiff has suffered damages.

127. Defendants' failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYSHRL was intentional, willful, or with reckless disregard.

128. Despite being aware of the accessibility needs of prospective tenants and their obligations under the law, Defendants have failed to modify or adjust these non-compliant features or provide alternative accessible routes in violation of the NYSHRL.

129. Defendants have failed to ensure the accessibility of the Subject Properties' common areas and have failed to provide accessible features in its residential units in violation of the NYSHRL.

130. As set forth above, Defendants discriminated against individuals with mobility disabilities on the basis of disability in violation of the NYSHRL. Plaintiff has been injured as a result of Defendants' discriminatory conduct, and has suffered damages.

131. The NYSHRL extends a cause of action and relief to "any person claiming to be

aggrieved" by an unlawful discriminatory practice. N.Y. Exec. L. § 297(9).

132. Plaintiff is therefore entitled to injunctive relief, punitive damages, attorneys' fees, and compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct as hereinbefore alleged pursuant to N.Y. Exec. L. §§ 297(9), (10).

**THIRD CAUSE OF ACTION**

New York City Human Rights Law, N.Y. Admin. Code § 8-107(5)
Against All Defendants

133. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

134. At all times relevant to this action, the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, has been in full force and effect and has applied to Defendants' Subject Properties.

135. Plaintiff is "person" and a "person aggrieved" by Defendants' unlawful practices as defined by New York City Administrative Code § 8-102.

136. At all times relevant to this action, Defendants' Subject Properties have each been a "housing accommodation" within the meaning of N.Y.C. Admin. Code § 8-102(10).

137. The New York Court of Appeals has recognized that "the NYCHRL was intended to be more protective than the state and federal counterparts . . . with the aim of making it the most progressive in the nation." *Makinen v. City of N.Y.*, 30 N.Y.3d 81, 88 (N.Y. 2017) (cleaned up). In *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62 (1st Dep't 2009), for example, the Appellate Division "adopt[ed] a new . . . standard for determining liability" in favor of a new standard "that 'is most faithful to the uniquely broad and remedial purposes of [the statute]'"—even "without any input from the parties concerned." *Id.* at 83 (Andrias, J., concurring); *see also id.* at 78. The majority opinion in Williams was one of three opinions ratified by the Restoration Act as having "correctly understood and analyzed the liberal construction requirement of . . . [8-130] and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of [the

NYCHRL].” N.Y.C. Admin. Code § 8-130(c).

138. Defendants designed and constructed the Subject Properties in violation of the accessibility requirements found in New York City Administrative Code § 28-701.2, § BC 1101. By doing so, Defendants are discriminating in the furnishing of facilities or services in connection with housing accommodations based on disability in violation of New York City Administrative Code § 8-107(5)(a)(2).

139. As a direct and proximate result of Defendants’ failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYCHRL, Plaintiff has suffered damages.

140. Defendants’ failure to design and construct the Subject Properties in compliance with the accessibility requirements of the NYCHRL was intentional, willful, or with reckless disregard.

141. As set out above, absent injunctive relief, there is a clear risk that Defendants’ actions will continue to occur and continue to frustrate Plaintiff’s mission.

142. Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants’ discriminatory conduct, as hereinbefore alleged pursuant to N.Y.C. Admin. Code § 8-502(a).

143. Plaintiff is further entitled to an award of punitive damages pursuant to N.Y.C. Admin. Code § 8-502(a).

144. Plaintiff is further entitled to an award of attorney’s fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

145. Plaintiff has caused to be served a copy of this Complaint upon the City Commission on Human Rights and Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

A. Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of the FHA, the NYSHRL, and the NYCHRL.

B. Enjoin Defendants and their agents, employees, and successors, and all other persons in active concert or participation from discriminating on the basis of disability, including the following:

i. Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination;

ii. Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact available;

iii. Denying or withholding housing or otherwise making housing unavailable on the basis of disability;

iv. Discriminating in the terms, conditions, or privileges of Defendant's housing and/or services;

v. Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling;

vi. Refusing to administer programs in a manner that does not discriminate against people with disabilities;

vii. Refraining from inquiring about a potential resident's use of a wheelchair or other assistive mobility devices during the application process, including during the site tour

or in the application materials; initial telephone inquiries, tours, meetings or other informal interactions occurring before an assessment that is intended to develop a plan of care and determine any necessary accommodations or modifications; and

viii. Using criteria or methods of administration, the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their federally assisted program or activity for qualified individuals with a particular disability; and

ix. Discriminating against persons with disabilities in the design and/or construction of all covered multi-family residential properties.

C. Order Defendants:

i. to make all necessary modifications to their policies, practices, and procedures to comply with the FHA, the NYSHRL, and the NYCHRL;

ii. to modify the Subject Properties to ensure compliance with accessibility standards, including but not limited to removing physical barriers, modifying thresholds, installing accessible hardware, and ensuring that common areas are accessible to individuals with a wide range of disabilities;

iii. to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against individuals with disabilities by failing to provide appropriate auxiliary aids and services to ensure meaningful access;

iv. to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals with disabilities of their right to reasonable accommodation, reasonable modification, and fair housing practices;

v. to train all their employees, staff, and other agents on a regular basis about the rights of individuals with disabilities under the FHA, the NYSHRL, and the NYCHRL;

vi. to implement a program of testing Defendants' employees, staff, and other

agents to determine whether they are complying with the requirements of the FHA, the NYSHRL, and the NYCHRL;

vii. to use human models on websites and in other marketing materials that depict residents with mobility disabilities, including residents who use wheelchairs;

viii. to allow monitoring of their application, admission and retention process;

ix. to retain advertising, application, admission, and retention records to allow for appropriate monitoring; and

x. to submit any changes to Defendant's policies for FHJC and court approval.

D. Award such damages to Plaintiff FHJC as will fully compensate for the injuries caused by Defendants' unlawful practices.

E. Award to Plaintiff:

i. Compensatory damages;

ii. Punitive damages pursuant to the FHA and the NYCHRL;

iii. Nominal damages;

iv. Reasonable costs and attorney's fees;

v. Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

vi. Any and all other relief that this Court finds necessary and appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated: August 24, 2026

Respectfully submitted,

/s/ David John Hommel
David John Hommel, Esq.
Andrew Rozynski, Esq.

EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, NY 10003
Tel: (212) 353-8700
Fax: (917) 591-2875
dhommel@eandblaw.com
arozynski@eandblaw.com
*Attorneys for Plaintiff*